# EXHIBIT 2

\*\*\*EFILED\*\*
Case Number 2020L 00155
Date: 11/4/2020 5:45 PI
Mark Von Nid
Clerk of Circuit Cour
Third Judicial Circuit, Madison County Illinoi

## IN THE CIRCUIT COURT
## THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| HOLTZMAN ENTERPRISES, INC., on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No.: **2020L 001558** |
| v. | ) ) | |
| CONTINENTAL CASUALTY COMPANY | ) ) | JURY TRIAL DEMANDED |
| and | ) ) | |
| CNA FINANCIAL CORPORATION, | ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ................................................................................................ 1

II.  THE PARTIES................................................................................................................... 4

III. JURISDICTION AND VENUE ....................................................................................... 5

IV. FACTUAL ALLEGATIONS ........................................................................................... 6

    A.     The Global COVID-19 Pandemic .................................................................. 6

    B.     Steps Taken by Authorities to Control the Pandemic ..................................... 9

    C.     The Damaging Impact of the COVID-19 Pandemic on Plaintiff and Similar Businesses ............................................................................................................... 12

    D.     Plaintiff's Business Insurance Policy with Defendants................................. 14

    E.     Defendants' Denial of Plaintiff's Claim....................................................... 19

V.  CLASS ALLEGATIONS ............................................................................................... 28

VI. JURY DEMAND ............................................................................................................ 32

    Count I: Business Income Breach of Contract.................................................... 33

    Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income................................................................................. 34

    Count III: Declaratory Relief.............................................................................. 35

    Count IV: Extra Expense Breach of Contract..................................................... 37

    Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing ...................... 38

    Count VI: Declaratory Relief.............................................................................. 39

    Count VII: Violation of the Colorado Consumer Protection Act, ....................... 41

    Colo. Rev. Stat. § 6-1-105(1), *et seq*................................................................... 41

    Count VIII: Business Income Breach of Contract .............................................. 44

    Count IX: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income................................................................................. 45

    Count X: Declaratory Relief............................................................................... 46

Count XI: Extra Expense Breach of Contract ................................................................ 48

Count XII: Breach of the Implied Covenant of Good Faith and Fair Dealing ................... 49

Count XIII: Declaratory Relief ..................................................................................... 50

VII. PRAYER FOR RELIEF .............................................................................................. 52

PLAINTIFF HOLTZMAN ENTERPRISES, INC. ("Plaintiff"), individually and on behalf of other similarly situated persons and entities, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the covenant of good faith and fair dealing, breach of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq*., and declaratory and injunctive relief against CONTINENTAL CASUALTY COMPANY ("Continental"), and CNA FINANCIAL CORPORATION ("CNA") (collectively "Defendants"), demanding a trial by jury.

## I. NATURE OF THE ACTION

1.  Plaintiff owns and operates nearly four dozen Great Clips franchised hair salons in Colorado and Missouri. To make sure that it would be protected if it was forced to temporarily cease some or all of its operations by unanticipated events beyond its control, it purchased a commercial insurance policy from Defendants covering the period of February 11, 2020-February 11, 2021. That policy is attached hereto as Exhibit A.

2.  Aside from Plaintiff, many other businesses in Colorado and Missouri have purchased insurance from Defendants to protect against losses from unexpected catastrophic events. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

3.   Defendant CNA is an insurance holding company that provides commercial insurance to businesses through its subsidiary Defendant Continental. Among its offerings is Business Interruption coverage, often called Business Interruption or Business Income coverage, offered to protect businesses from the risk of being forced to suspend their operations because of an unexpected disaster. As CNA states on its website promoting this coverage, "[n]othing should stand in the way of your ability to deliver your products, services and expertise to your customers":[1]



4.   Although on this web page, CNA mentions "events such as fire or wind damage," nothing in its policy is limited to damage from fire or wind. In fact, as shown below its policies cover all risks unless excluded or limited, and nothing excludes or limits the losses in this case.

---

[1] https://www.cna.com/web/guest/cna/ps/products/CT-AnyBusinessInterruptionProdML?industry=AnyIndustry&specialization=AnySpecialization&businessSize=AnySize (accessed 11/3/2020).

20-L-_____
Page 2 of 54

5.   The very type of unanticipated event for which Plaintiff and other businesses needed protection occurred in early 2020. That event, the worst health crisis to hit the States of Colorado and Missouri, the United States, and indeed the world in over a century, was a worldwide pandemic of a disease called COVID-19. It caused a massive number of illnesses and an extraordinarily high number of deaths.

6.   As a result of the pandemic and to protect against its spread, on March 19, 2020, the Colorado Department of Public Health ordered all hair salons closed.[2] Missouri counties where Plaintiff's salons are located issued stay-at-home orders around the same time that had the same effect.

7.   These restrictions – and indeed, the pandemic itself – have had a devastating effect on businesses throughout the country. Because Plaintiff and other businesses sustained a loss of their ability to access and use their property, they have sustained unimaginable business losses. They also incurred extra expenses due to having to purchase protective equipment upon re-opening.

8.   Those losses and expenses are covered in Defendants' policies, which provide that CNA will pay for the loss of business income due to a necessary suspension of operations caused by direct physical loss of or damage to property.

9.   However, despite this provision of business interruption coverage in its policies, Defendants are refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their property.

---

[2] https://drive.google.com/file/d/1aMOxiYDg1lI2U0EbkpyK8bBQT0sWJJhT/view (accessed 11/3/2020).

10. CNA publicly proclaims that refusal on its website, but in doing so, it misstates what its policies provide. It states that coverage requires "loss or damage *to* insured property."[3] However, its policies provide for coverage where there is "loss *of* or damage to property." Plaintiff and similarly situated businesses suffered loss of their property because they were unable to access it to operate their businesses. But CNA prefers to ignore that little, but vital, word "of."

11. Plaintiff therefore brings this action on behalf of itself and similarly situated businesses in Colorado and Missouri that (a) purchased standard commercial property insurance policies from Defendants that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics and (b) have suffered business income and extra expense losses.

12. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II. THE PARTIES

13. Holtzman Enterprises, Inc., is a Missouri corporation that is qualified to transact business as a foreign corporation in Colorado, with a principal office at 8501 Turnpike Dr., Ste 103, Westminster, CO 80031; it operates approximately 30 franchised Great Clips hair salons in Colorado and 14 in Missouri.

---

[3] https://www.cna.com/web/wcm/connect/a81b05f0-582f-43e5-96d6-
9cf912b281c9/CNA+Notice+to+Agents+Brokers+and+Policyholders+BI+Coverage+Info.pdf?MOD=AJPERES
(accessed 11/3/2020) (highlighting added).

14. Defendant CNA is an insurance holding company incorporated in Delaware with its principal place of business at 151 N. Franklin Street, Chicago, IL 60606. It sells commercial insurance policies through Defendant Continental.

15. A number of facts establish that Plaintiff had an agreement with Defendant CNA:

      a. The Policy is a "CNA Connect®" policy. Ex. A at 6, 204. According to CNA's website, "CNA Connect®" is "*our* business owners policy."

      b. The Policy states: "THE BILLING FOR THIS POLICY WILL BE FORWARDED TO YOU DIRECTLY FROM CNA" and the premium of $35,469.00 "WILL BE INVOICED BY CNA ON A SEPARATE STATEMENT ACCORDING TO THE PAYMENT OPTION YOU SELECT." Ex. A at 205.

      c. CNA did in fact bill Plaintiff with invoices sent to Plaintiff's address in Colorado. *See*, *e.g.*, Ex. B (invoice dated 1/20/2020 from CNA to Plaintiff's address in Colorado.

      d. Plaintiff paid the invoices with checks made out to "CNA Insurance."

16. Defendant Continental is an insurance company incorporated in Illinois with its principal place of business at 151 N. Franklin Street, Chicago, IL 60606.

### III. JURISDICTION AND VENUE

17. This Court has personal jurisdiction over Defendants because Defendants reside in this state.

18. Defendants conduct their usual and customary business within Madison County, including by soliciting business in Madison County to Madison County residents, selling their

products through agents at multiple office locations in Madison County, and servicing customers in Madison County.[4] Accordingly, venue is proper in this district because Defendants are doing business in and, are therefore, residents of, Madison County, Illinois.

## IV. FACTUAL ALLEGATIONS

### A. The Global COVID-19 Pandemic

19. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[5] It spreads easily from person-to-person.[6]

20. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[7] As WebMD states, "Some people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[8]

21. Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

22. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[9]

---

[4] *See* https://www.cna.com/web/guest/cna/home ("Find an Agent" button at bottom of webpage) (last visited Nov. 2, 2020).
[5] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 11/3/2020).
[6] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 11/3/2020).
[7] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 11/3/2020).
[8] *Id.*
[9] *Id.*

23. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a business that contain the virus. It can live on plastic and stainless steel for up to three days.[10]

24. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[11]

25. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[12] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[13] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019."[14]

26. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[15]

---

[10] *Id.*

[11] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 11/3/2020).

[12] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 11/3/2020).

[13] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 11/3/2020).

[14] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 11/3/2020).

[15] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 11/3/2020).

27. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[16] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[17]

28. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[18]

29. According to the COVID Tracking Project, by that same date, March 11, 2,873 patients had tested positive in the United States, and 43 patients had died. From that date on, the number of cases and deaths increased exponentially. By March 19, when the State of Colorado ordered all hair salons, along with other businesses, closed, the number of cases nationwide had increased nearly seven times to 19,770, and the number of deaths had increased nearly five times to 199.[19]

30. Colorado was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there were 28 cases in Colorado and no deaths. But by the time the State closed non-essential businesses including hair salons, the number of cases had increased to 216 reported cases, with

---

[16] https://www.merriam-webster.com/dictionary/pandemic (accessed 11/3/2020).
[17] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 11/3/2020).
[18] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 11/3/2020).
[19] https://covidtracking.com/data/us-daily (accessed 11/3/2020).

two deaths. By late April, Colorado was averaging more than 600 new cases, roughly 1,000 hospitalizations, and 40 deaths a day.[20]

31. Similarly, Missouri was hit by COVID-19 later than other states, but once it arrived it also spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of November 2, 2020, there had been 194,990 cases, and 3,097 COVID-19 deaths in Missouri.[21]

32. As of November 2, 2020, according to the *New York Times*, 9.3 million Americans had tested positive, and 231,182 had died.[22] That was more than any other country in the world and the 14th and 13th highest on a per capita basis, respectively.[23]

**B. Steps Taken by Authorities to Control the Pandemic**

33. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[24]

34. Three days earlier, Governor Jared Polis had declared a state of emergency in Colorado.[25]

---

[20] https://covidtracking.com/data/state/colorado (accessed 11/3/2020).

[21] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 11/02/2020).

[22] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 11/02/2020).

[23] *Id.*

[24] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 11/3/2020).

[25] https://www.colorado.gov/governor/news/gov-polis-provides-update-states-response-covid-19 (accessed 11/3/2020).

35. On March 13, Governor Mike Parson signed an executive order declaring a state of emergency in Missouri due to COVID-19.[26]

36. In Public Health Order 20-22, the Colorado Department of Public Health and Environment ordered that all nonessential personal services, including hair salons, be closed to ingress, egress, use, and occupancy by members of the public beginning at 8:00 AM March 19, 2020, through April 30.[27]

37. On March 25, 2020, Governor Polis ordered all Coloradans to stay at home, subject to limited exceptions, beginning the next day at 6:00AM and extending through April 11. He also directed all businesses other than those designated as "Critical Businesses" under Public Health Order 20-24, to close.[28] Hair salons did not qualify as Critical Businesses, and therefor they were ordered closed.[29]

38. Governor Polis extended until April 26 and again until May 4 the order that businesses other than Critical Businesses be closed.[30]

39. Various local jurisdictions where Plaintiff's Colorado salons are located issued similar orders. Denver was typical. On March 16, it adopted the state's Stay at Home orders.[31] Those

---

[26] https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (accessed 11/3/2020).
[27] https://drive.google.com/file/d/1aMOxiYDg1lI2U0EbkpyK8bBQT0sWJJhT/view (accessed 11/3/2020).
[28] Executive Order D 2020 017, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20017%20Ordering%20Coloradans%20to%20Stay%20at%20Home_0.pdf (accessed 11/3/2020).
[29] https://drive.google.com/file/d/1ndUBYTXVM7yULGMiDPRhjVrUj8qTF2pk/view (accessed 11/3/2020).
[30] Executive Order 2020 024, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20024%20Amending%20and%20Extending%20Executive%20Order%20D%202020%20017%20Stay%20at%20Home%20Order_0.pdf; Executive Order D 2020 044, https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20044%20Safer%20at%20Home.pdf (both accessed 11/3/2020).
[31] https://www.denvergov.org/content/dam/denvergov/Portals/covid19/documents/public-orders/DenverStayAtHomeOrder_DDPHE.pdf (accessed 11/3/2020).

orders were ultimately extended through May 8.[32] On May 8, Denver finally allowed hair salons to reopen the following day.[33]

40. Similar restrictions were ordered in Missouri. On April 3, 2020, the Missouri Department of Health and Senior Services issued a "Stay at Home" Order,[34] which did not allow individuals to leave home to visit hair salons. After an extension, that Order remained in effect through May 3, 2020.[35]

41. Orders closing hair salons were put into effect at the County level in Missouri even earlier. For instance, on March 21, 2020, St, Louis County Executive Dr. Sam Page issued an Executive Order commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, inter alia, to "perform tasks *essential* to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[36] That order did not allow visits to hair salons. That same day the County Director of Public Health issued an Amended Stay at Home Order that did not allow hair salons to remain open.[37] That order was extended on April 20.[38]

---

[32] https://www.denvergov.org/content/denvergov/en/mayors-office/newsroom/2020/City-and-County-of-Denver-COVID-19-Response-Update.html (accessed 11/3/2020).
[33] https://www.denvergov.org/content/denvergov/en/covid-19/coronavirus-news/may-2020/denver-sets-criteria-for-businesses-reopening.html (accessed 11/3/2020).
[34] https://governor.mo.gov/priorities/stay-home-order (accessed 11/3/2010).
[35] https://governor.mo.gov/priorities/stay-home-order (accessed 11/3/2020).
[36] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 11/3/2020) (emphasis added).
[37] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-amended-stay-at-home-order/ (accessed 11/3/2020).
[38] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-extension-and-amendment-of-stay-at-home-order/ (accessed 11/3/2020).

42. Similarly, as of March 23, 2020, hair salons were ordered closed in the City of St. Louis through April 22, later extended indefinitely. [39]

43. On March 23, 2020, St. Charles County Executive Ehlmann issued an order that every person in the County must remain in their residence or surrounding property except to engage in "(a) activities they deem essential to their physical, mental, and spiritual well-being, or (b) employment ...."[40] That ruled out visiting hair salons.

44. St. Louis County, where most of Plaintiffs' Missouri salons are located, didn't allow reopening of hair salons and other businesses until May 18.[41]

### C.  The Damaging Impact of the COVID-19 Pandemic on Plaintiff and Similar Businesses

45. The COVID-19 pandemic, along with the restrictions described above, have had a devastating impact on Plaintiff's business.

46. All of Plaintiff's salons in Colorado and Missouri closed on March 19 because of the pandemic, the day that the State of Colorado ordered all hair salons closed.

47. After the State of Colorado allowed hair salons to re-open on May 9, Plaintiff began to prepare to re-open its Colorado salons. It was able to reopen ten Colorado salons on or about May 11, approximately another ten on or about May 18 and the balance by May 31.

48. After St. Louis County allowed hair salons to reopen on May 18, Plaintiff was able to reopen most of its Missouri salons later that week and the rest shortly thereafter.

---

[39] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 11/3/2020).
[40] https://www.sccmo.org/DocumentCenter/View/15365/20-06-Executive-Order-PDF (accessed 11/3/2020).
[41] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 11/3/2020).

49. Three of Plaintiff's salons were permanently closed.

50. The timing of these re-openings was affected by the enormous work involved in reopening more than 40 salons. In addition, a number of Plaintiff's employees were uncomfortable coming back, leading to staffing issues that had to be resolved before the salons could reopen.

51. To comply with various county and city requirements, Plaintiff has had extra expenses since reopening because of the need to purchase items such as additional hand sanitizers, masks/face guards, disinfectants, and capes. Plaintiff has also had to hire receptionists to maintain customer social distancing.

52. Since reopening, Plaintiff's business has continued to be adversely affected because of the pandemic. For instance, Plaintiff's business has been impacted by the need to meet social distancing requirements in its salons and the requirement to take only appointments rather than walk-ins.

53. Nationwide the hair salon industry has been devastated by COVID-19. One survey found that 70% had to furlough or layoff staff during the shutdown over the pandemic. The survey was conducted from May 15-June 5. Only 23% had reopened at the time they responded.[42]

54. The Professional Beauty Association states: "Salons across the country are struggling financially and many will not make it through this crisis."[43]

---

[42] https://salonspanetwork.org/beauty-pulse-survey-covid-19-recovery/ (accessed 11/3/2020).
[43] https://www.probeauty.org/advocacy/fica (accessed 11/3/2020).

**D. Plaintiff's Business Insurance Policy with Defendants**

55. In exchange for premiums paid by Plaintiff to Defendants, Plaintiff obtained an insurance policy under Policy Number B 1010814757, issued to Holtzman Enterprises Inc., 8501 Turnpike Dr., Ste 103, Westminster, CO 80031, covering a Policy Period from 2/11/2020 to 2/11/2021 (Exhibit A at 6; "the Policy") (page numbers refer to the page of the PDF).

56. The Policy contains a "Forms and Endorsements Schedule" showing Forms, Schedules and Endorsements "that are a part of this policy." Ex. A at 49. One of those Forms is "Business Income and Extra Expense," shown as having the Form number SB146802E. *Id.*

57. The "Business Income and Extra Expense Form," Form SB146802E, modifies the Businessowners Special Property Form. It states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by *direct physical loss of* or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. A at 89 (emphasis added).

58. As can be seen, the Policy provides coverage not just for *damage* to property at the premises, but also for "loss of" property. Plaintiff suffered loss of property when the COVID-19 pandemic prevented it from using its property for its intended business functions of operating a hair salon.

59. The Policy's Renewal Declaration states that Business Income and Extra Expense Coverage includes "12 Months Actual Loss Sustained." Ex, A at 7.

60. The Policy's Renewal Declaration contains a Schedule of Locations that lists 44 locations where Plaintiff's salons are located. Ex. A at 8-40. Thus, those 44 salons are all covered under the Business Income and Extra Expense coverage.

61. The Business Income and Extra Expense Form defines Business Income as the:

      a.  Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred … [and]

      b.  Continuing normal operating expenses incurred, including payroll …..

Ex. A at 89.

62. The Policy also covers Extended Business Income for losses that occur after the property is restored, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph 1, we will pay for the actual loss of Business Income you sustain during the period that:
>
> a. Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and
>
> b. Ends on the earlier of:
>
>> (1) The date you could restore your "operations" with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage occurred; or
>>
>> (1) 60 consecutive days after the date determined in paragraph a. above.
>
> However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of loss in the area where the described premises are located.

Ex. A at 90.

63. "Suspension" means "[t]he partial or complete cessation of your business activities ...."
Ex. A at 86. That applies to Plaintiff's Business Income losses because, as a result of the
COVID-19 pandemic, its business activities partially or completely ceased.

64. "Operations" means "the type of your business activities occurring at the described
premises ...." Ex. A at 84. That applies to Plaintiff's operation of its salons.

65. For Business Income coverage, "period of restoration ... [b]egins with the date of direct
physical loss or damage caused by or resulting from any Covered Cause of Loss at the described
premises" and ends when business is "repaired, rebuilt or replaced with reasonable speed and
similar quality ....". Ex. A at 84.

66. According to the Merriam-Webster Dictionary, "Repair" means "to restore to a sound or
healthy state."[44]

67. Plaintiff's "period of restoration" began on the date it had to close each salon because of
the risk of keeping it open during the COVID-19 pandemic. It ended for each salon when it re-
opened after taking measures to restore the salons to a healthy state by purchasing protective
items such as additional hand sanitizers, masks/face guards, disinfectants, and capes and hiring
receptionists to maintain customer social distancing

68. The COVID-19 pandemic caused a direct physical loss of property at Plaintiff's premises
at the Scheduled Locations by denying Plaintiff the ability to physically access and use the
property in the normal fashion in its business and/or denying it, its employees and others such as
customers the ability to physically access and use the property. It is therefore a covered loss.

---

[44] https://www.merriam-webster.com/dictionary/repair (accessed 10/30/2020).

69. The Policy sets forth the method to determine the amount of Business Income loss. It states that it will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any likely increase in Net Income attributable to an in the volume of business as a result if [sic] favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

Ex. A at 79.

70. The Policy also covers Extra Expense, which "means reasonable and necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss." Ex. A at 90.

71. The Policy sets forth the method of determining recoverable Extra Expense. It states that it will be based on:

(1) All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

> (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

Ex. A at 79.

72. The COVID-19 pandemic is a "covered cause of loss" under The Policy. Covered Causes of Loss are described as follows:

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section B. EXCLUSIONS;

b. Limited in paragraph A. 4. Limitations; or

c. Excluded or limited by other provisions of this policy.

Ex. A at 68-69.

73. None of the Exclusions or Limitations, or limits in the Policy apply to Plaintiff's losses from the COVID-19 pandemic. In particular, there is no exclusion for losses caused by a virus or pandemic. Accordingly, Plaintiff's losses are due to a covered cause.

74. The Policy also contains a provision, entitled "Civil Authority" that provides for Business Income and Extra Expense Coverage where the loss is "caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property other than described premises, caused by or resulting from a Covered Cause of Loss." Ex. A at 115.

75. Because Plaintiff was prohibited from accessing its premises by government orders due to direct physical loss of or damage to locations other than Plaintiff's described premises – namely locations contaminated by the coronavirus – it is covered by this provision.

76. For the above reasons, Plaintiff and Class Members are entitled to coverage under the above provisions of the Policy.

### E. Defendants' Denial of Plaintiff's Claim

77. Defendants have taken no steps to cover their insureds for their COVID-related business losses. To the contrary, they tell insureds and the public that these business losses are not covered.

78. CNA has a web page entitled, "Helping Our Customers Navigate COVID-19" in which it says, "We're Here to Help":[45]

---

[45] https://www.cna.com/web/guest/cna/sp/helping-our-customers-navigate-covid-19 (accessed 7/15/2020).



79. Although CNA says it's "here to help," nowhere on this page does Defendant CNA acknowledge to its customers that their COVID-19 losses are covered by any of their policies. By omitting that acknowledgement, Defendant CNA is attempting to convey the message that these losses are not covered.

80. That page has a link to "Business Interruption Coverage Information." *Id*. Clicking on that link brings up a page entitled, "Notice to Agents, Brokers and Policyholders – Business

Interruption Coverage Information," which attempts to convince policyholders that they are not covered for COVID-19 losses. But in doing so, it *misstates what its policies provide*:[46]

**CNA**

CNA Center
151 N Franklin Street
Chicago, IL 60606
www.cna.com

**Notice to Agents, Brokers and Policyholders – Business Interruption Coverage Information**

Many property insurance policies issued by the CNA insurance companies include business interruption coverage. Because coverage varies across policies, you will need to read your policy and consult with your insurance broker or agent for more specific information. In general, however, in order to qualify for business interruption, you first would need to establish direct physical loss or damage, caused by a covered peril, to your covered property and/or property at a covered location. To invoke coverage for business interruption, that direct physical loss or damage must cause an interruption to your business. An example of a business interruption loss is a fire in your office that requires you to suspend your business activities because the fire has caused direct physical loss or damage to insured property.

81. That statement is wrong, and CNA must know that it is wrong. Its policies do not simply cover "loss or damage *to* insured property." As shown above, they provide coverage for a "physical loss *of* or damage to" property. In purporting to describe its policies, CNA omitted the word "of" to make it appear that a "loss *of* property" is not covered. But a "loss of property" is covered.

82. Because of that word "of," Plaintiff's losses and those of Class Members are covered in that they had a loss of their property due to the COVID-19 pandemic.

---

[46] https://www.cna.com/web/wcm/connect/a81b05f0-582f-43e5-96d6-
9cf912b281c9/CNA+Notice+to+Agents+Brokers+and+Policyholders+BI+Coverage+Info.pdf?MOD=AJPERES
(accessed 11//2020) (highlighting added).

83. An insurance policy is, ultimately, simply a contract where the insured agrees to pay insurance premiums and the insurance company agrees to pay the insured, up to the policy limits, for losses covered by the policy. However, unlike most contracts, the insurer is usually not called upon to perform (since, after all, insurance protects against the unexpected). When the insurer's performance is required, it only arises when the insured is, by definition, in a desperate financial position. Once a loss occurs, an insured can no longer buy protection for that loss from competing insurers – in essence, the insurer has exclusive and complete control over the evaluation, processing and denial of that claim.

84. The implications of this disparity here is clear. Defendants' strategy is to discourage policyholders from making claims in the hope that it will never even have to face their claims, much less pay them.

85. Despite that strategy, Plaintiff made a claim on its policy through counsel on July 9, 2020, asking Continental to respond by July 16. (Ex. C.).

86. Michael P. Cambre, CNA's Claim Specialist – Property Field and Catastrophe Claim, responded twice with questions, such as asking Plaintiff to "send in the governmental mandates specific to the insured's business closings." Plaintiff answered those questions fully through counsel, for example by providing citations to the government orders that mandated closing of hair salons in Plaintiff's area of business – even though those orders are publicly available and presumably a multi-billion dollar insurance company like CNA was already well-aware of them. (Ex. D).

87. Despite responding twice with questions, CNA did not provide a decision by Plaintiff's requested date of July 16 and did not ask for more time to consider the claim. Defendants did

issue a formal denial of coverage in a letter from Christopher Weisel, "Litigation Consultant," dated October 19, 2020, in which they explain the purported basis of their decision. (Ex. E) ("denial letter").

88. In the denial letter, Defendants improperly take the position that with respect to the Business Income and Extra Expense provisions of Plaintiff's policy, "there is no indication that HEI's operations were suspended as a result of "direct physical loss of or damage to property." Ex. E at 7. As set forth above, Plaintiff's operations were suspended based on a "loss of" property. Defendants' assertion is therefore incorrect.

89. Furthermore, although, as addressed above, Plaintiff is covered by the "Civil Authority" provision of the Policy, Defendants improperly claim that the Policy provides no such coverage. *Id*. at 8-9.

90. The denial letter also speculates that "[e]ven if there had been direct physical loss of or damage to property at the described premises or at locations other than the described premises, as required under the Policy provisions, the Policy also contains exclusions that *might* bar coverage for HEI's claim." (emphasis added). "For example, the Policy contains an exclusion for microbes, defining microbe as 'any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease.' (Endorsement SB-147084-B, Fungi, Wet Rot, Dry Rot and Microbe Exclusion/Limited Coverage section F.)". That was not a ground for rejection of the claim.

91. Moreover, although as addressed below Plaintiff's losses were not caused by the presence of microbes or coronavirus on its premises, if Defendants intended to exclude "viruses" they

could and would have stated that viruses are excluded, as they did for "fungi" and "wet or dry rot." Ex. A at 157.

92. Moreover, viruses are not microbes, as Defendants define that term, "non-fungal microorganism or non-fungal, colony-form organism that causes infection or disease." Ex. A at 156. The term "organism" refers to a "form of life."[47] As Dr. John Coffin, American Cancer Society Professor of Molecular Biology and Microbiology at Tufts University, states, viruses are "not really living organisms—they can't carry out on their own any of the functions that we consider to be connected with life. They don't contain the ability to replicate themselves without being inside of a cell."[48]

93. Other scientists agree that viruses are not alive because they are "inert unless they come into contact with a living cell."[49]

94. The definition of "microbes" in the Policy goes on to state, "But 'microbe' does not mean microbes that were transmitted directly from person to person." Ex. A at 156. The coronavirus was certainly transmitted from person to person. That is how it spread. If it had not been transmitted from person to person, there would have been no reason to close Plaintiff's salons.

95. Thus, the microbe exclusion in Plaintiff's policy would not apply as to the coronavirus.

---

[47] *See* https://www.dictionary.com/browse/organism (defining "organism" as including 1: "a form of life composed of mutually interdependent parts that maintain various vital processes" and 2: "a form of life considered as an entity; an animal, plant, fungus, protistan, or moneran," (accessed 11/3/2020)

[48] https://now.tufts.edu/articles/what-are-viruses-and-how-do-they-work, quoting John Coffin, American Cancer Society Professor of Molecular Biology and Microbiology at Tufts University (accessed 10/27/2020).

[49] https://www.livescience.com/58018-are-viruses-alive.html#:~:text=Viruses%20are%20infectious%2C%20tiny%20and.allows%20them%20to%20self%2Dreplicate. , quoting Dr. Amesh Adalja, infectious disease physician and adjunct professor at John Hopkins University; also quoting Dr. Otto Yang, professor of medicine and microbiology, immunology and molecular genetics at the David Geffen School of Medicine at the University of California, Los Angeles, for the proposition that viruses are "really not alive" because "[w]ithout a cell, a virus cannot reproduce." (accessed 11/3/20).

96. Furthermore, the microbe exclusion would not exclude Plaintiff's losses due to the COVID-19 pandemic because those losses were not caused by the presence of microbes on the premises of Plaintiff's businesses; they were caused by the COVID-19 pandemic, rather than the presence of coronavirus on Plaintiff's property or the members of the Classes.

97. The microbe exclusion states:

**"Fungi, Wet Rot, Dry Rot and Microbes**

Presence, growth, proliferation,, spread or any activity of "fungi," wet or dry rot, or "microbes."

Ex. A. at 157.

98. Plaintiff's losses were not caused by the presence of microbes in its premises and there is no evidence that the coronavirus has ever been in its premises. Plaintiff's losses were caused by the COVID-19 pandemic and its need to close its businesses in compliance with local orders. Had Defendants intended to exclude losses that might be related to a pandemic or to a virus in another location than the insured's property, it could have so provided but did not.

99. Furthermore, even if the Microbe Exclusion covered viruses and was applicable to the losses of Plaintiff and Class members, under the principles of regulatory estoppel and general public policy, Defendants should be estopped from enforcing it.

100. Specifically, in 2006, two insurance industry trade groups, the ISO and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

101. In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

102. In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

103. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

> This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded...

104. These representations made by the insurance industry were false.

105. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

106. Upon information and belief, the state insurance departments relied on the industry's and Defendants' representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

107. The assertions made by the insurance industry and Defendants to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, Defendants should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

108. In securing approval for the adoption of the Virus Exclusion by misrepresenting to the state regulators that the Virus Exclusion would not change the scope of coverage, Defendants effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

109. Under the doctrine of regulatory estoppel, the Court should not permit Defendants to benefit from this type of duplicitous conduct before the state regulators.

110. The denial letter also states that the exclusion for "loss or damage caused by or resulting from consequential loss, meaning loss of use, delay, or loss of market" might bar coverage. *See* denial letter, 9. This was not a ground for rejection of the claim, and moreover, Defendant does not explain what is meant by "[d]elay, loss of use or loss of market" (Ex. A. at 72) which are not defined terms in the policy and have no clear meanings.

111. Furthermore, this is one of the exclusions without the proviso that it applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." That proviso applies to the exclusions set forth under Section B.1. *See* Ex. A at 69-70. But this exclusion is set forth under Section B.2, which simply states: "We will not pay for loss or

damage caused by or resulting from any of the following:" Ex. A at 72. Thus, the exclusion (as set forth in Section B.2(b)) does not apply because there are other causes, such as the pandemic. Defendants could have made it an exclusion under Section B.1, but did not.

112. Similarly, the denial letter states that the exclusion for "loss or damage caused by or resulting from contamination" (set forth in B.2.d(8)) might bar coverage, but again, this was not a ground for rejection of the claim. Nor is "Contamination" defined in the policy (*see* Policy at 72), and Defendants provide no reason why this exclusion would exclude Plaintiff's losses. The denial letter also references an exclusion for "contaminants," (denial letter, 9), referring to "section B.2.k." But that section is an exclusion for "Pollution" (Ex. A, at 73), and Defendants provide no reason for why this exclusion would exclude Plaintiff's losses. It was also not a ground for the rejection of Plaintiff's claim. Moreover, the "regardless of any other cause …" proviso similarly does not apply to these exclusions, which are under Sections B.2.d.(8) and B.2.k., and, as a result, the exclusions do not apply where, as here, there are other causes, such as the pandemic.

## V. CLASS ALLEGATIONS

113. Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Pursuant to 735 ILCS 5/2-801 through 5/2-807, Plaintiff seeks certification of the following classes:

> a. All persons and entities in Colorado with Business Income (including Extended Business Income) coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Colorado Business Income Coverage Class").

b. All persons and entities in Missouri with Business Income (including Extended Business Income) coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Missouri Business Income Coverage Class").

c. All persons and entities in Colorado with Extra Expense coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for Extra Expense losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered Extra Expense losses (the "Colorado Extra Expense Coverage Class").

d. All persons and entities in Missouri with Extra Expense coverage under a policy issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for Extra Expense losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered Extra Expense losses (the "Missouri Extra Expense Coverage Class").

114. Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

115. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

116. This action has been brought and may be properly maintained on behalf of the Classes proposed herein under the Illinois Rules of Civil Procedure.

117. Numerosity. The members of each Class number more than 100 and are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records.

118. Commonality and Predominance. There are questions of law and fact common to each

Class, which predominate over any questions affecting individual members of each respective

Class. These common questions of law and fact include, without limitation:

      a.  Whether Plaintiff and the Class members suffered a covered loss under the
           common policies issued to members of the Class;

      b.  Whether Defendants wrongfully denied all claims based on COVID-19;

      c.  Whether Defendants' Business Income coverage applies to a suspension of
           business caused by COVID-19 and/or in response to the presence or threat of
           COVID-19;

      d.  Whether Defendants' Extra Expense coverage applies to efforts to avoid or
           minimize a loss caused by COVID-19;

      e.  Whether Defendants have breached their contracts of insurance through a uniform
           and blanket denial of all claims for business losses related to COVID-19 and/or
           the related actions of civil authorities taken in response to the presence or threat of
           COVID-19;

      f.  Whether Plaintiff and the Class members suffered damages as a result of
           Defendants' actions.

119. Typicality. Plaintiff's claims are typical of the claims of the Classes it seeks to represent.

Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising

out of and caused by Defendants' unlawful conduct.

120. Adequacy. Plaintiff is committed to the vigorous prosecution of this action and has

retained competent counsel experienced in the prosecution of class actions. Accordingly,

Plaintiff is an adequate representative and will fairly and adequately protect the interests of the

Classes.

121. Appropriateness. A class action is an appropriate method for the fair and efficient

adjudication of this controversy. Since the amount of each individual Class member's claim is

small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

122. Injunctive and Declaratory Relief. Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

123. In addition, particular issues are appropriate for certification under 735 ILCS 5/2-802(b) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests thereon. Such particular issues include, but are not limited to:

a. Whether the Business Income policies issued by Defendants cover Class members' business income losses and extra expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein;

b. Whether Class members' Business Income losses and extra expenses are covered by the "Civil Authority" provisions in its policies;

c. Whether the coverages for Business Income losses and extra expenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies;

d. Whether Defendants breached contracts by denying coverage for Business Income losses and extra expenses.

e. Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and extra expenses due to the COVID-19 pandemic;

f. Whether Defendants violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq.*, by engaging in deceptive trade practices;

g. Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct.

### VI. JURY DEMAND

124. Plaintiff demands a trial by jury on all claims so triable.

**Count I: Business Income Breach of Contract**
**(By Plaintiff and the Colorado Business Income Coverage Class)**

125. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

126. Plaintiff brings this claim individually and on behalf of the Colorado Business Income Coverage Class against Defendants.

127. Plaintiff's Policy and the policies of other Colorado Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

128. In the Policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

129. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

130. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

131. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

132. Defendants, without justification, have refused performance under the Policy and other

Class members' policies by denying coverage for these losses. Accordingly, Defendants are in

breach of the Policy and other Class members' policies.

133. Due to Defendants' breach of the Policy and other Class members' policies, Plaintiff and

other Class members have suffered actual and substantial damages for which Defendants are

liable, in an amount to be proved at trial.

### Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income
### (By Plaintiff and the Colorado Business Income Coverage Class)

134. Plaintiff realleges and incorporates by reference the allegations contained in all prior

paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads

this cause of action in the alternative.

135. Plaintiff brings this claim individually and on behalf of the Colorado Business Income

Coverage Class against Defendants.

136. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and

the Colorado Business Income Coverage Class in the following respects:

      a.  Unreasonably acting or failing to act in a manner that deprives Plaintiff and the
          Class of the benefits of their policies;

      b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a
          manner that deprives Plaintiff and the Class of the benefits of their policies;

      c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough
          investigation of all of the bases of Plaintiff's and the Class' claims;

      d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt,
          fair, balanced and thorough investigation of all of the bases of claims made under
          Plaintiff's and the Class' policies;

e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m. Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

137. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

138. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**Count III: Declaratory Relief**
**(By Plaintiff and the Colorado Business Income Coverage Class)**

139. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

140. Plaintiff brings this claim individually and on behalf of the Colorado Business Income Coverage Class against Defendants.

141. Plaintiff seeks a declaratory judgment pursuant to 735 ILCS 5/2-701.

142. Plaintiff's Policy and the policies of other Colorado Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

143. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

144. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

145. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

146. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

147. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

148. Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

149. An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the terms of the Policy and Class members' policies.

### Count IV: Extra Expense Breach of Contract
### (By Plaintiff and the Colorado Extra Expense Coverage Class)

150. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

151. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Coverage Class against Defendants.

152. Plaintiff's Policy and the policies of other Colorado Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

153. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

154. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

155. The extra expenses triggered the extra expense coverage under the Policy and other Class members' policies.

156. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

157. Defendants, without justification, have refused performance under the Policy and other

Class members' policies by denying coverage for these losses and expenses. Accordingly,

Defendants are in breach of the Policy and other Class members' policies.

158. Due to Defendants' breach of the Policy and other Class member policies, Plaintiff and

other Class members have suffered actual and substantial damages for which Defendants are

liable, in an amount to be proved at trial.

### Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By Plaintiff and the Colorado Extra Expense Coverage Class)

159. Plaintiff realleges and incorporates by reference the allegations contained in all prior

paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads

this cause of action in the alternative.

160. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Class

against Defendants.

161. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and

the Colorado Extra Expense Class with respect to the Extra Expense provisions in the following

respects:

      a.  Acting or failing to act in a manner that deprives Plaintiff and the Class the benefits of their policies;

      b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

      c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

      d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m. Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

162. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

163. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### Count VI: Declaratory Relief
### (By Plaintiff and the Colorado Extra Expense Class)

164. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

165. Plaintiff brings this claim individually and on behalf of the Colorado Extra Expense Class against Defendants.

166. Plaintiff seeks a declaratory judgment pursuant to 735 ILCS 5/2-701.

167. Plaintiff's Policy and the policies of other Colorado Extra Expense Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

168. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

169. A covered loss has resulted in business suspensions, which have caused Plaintiff's and Class members' losses.

170. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Class members' losses.

171. The extra expenses triggered the Extra Expense Coverage under the Policy and other Class members' policies.

172. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

173. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

174. Plaintiff and the Class members seek a judicial determination of whether the Extra

Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

175. An actual case or controversy exists regarding Plaintiff's and Class members' rights and

Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's Policy and

other Class members' policies.

### Count VII: Violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1), *et seq.* (By Plaintiff, the Colorado Business Income Coverage Class and the Colorado Extra Expense Class)

176. Plaintiff realleges and incorporates by reference the allegations contained in all prior

paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads

this cause of action in the alternative.

177. Defendants engaged in deceptive trade practices as defined by Colo. Rev. Stat. § 6-1-105

resulting in harm to Plaintiff and to the Colorado Classes.

178. Defendants' deceptive trade practices included, but were not limited to:

a.      knowingly or recklessly making a false representation as to the characteristics or
benefits of their Business Income, Extra Expense Coverage and Extended Business
Income Coverage policies, and by failing to disclose material information concerning
their Business Income, Extra Expense Coverage and Extended Business Income
Coverage policy products, which information was known at the time of advertisement or
sale, including: the true coverage that defendants intended to provide as a result of
business interruption from catastrophes, C.R.S. 6-1-105(e);

b.      representing that its Business Income, Extra Expense Coverage and Extended
Business Income Coverage policy products are of a particular standard, quality, or grade,
when they knew or should have known that they are of another, C.R.S. 6-1-105(e);

c.      failing to disclose material information concerning its Business Income, Extra
Expense Coverage and Extended Business Income Coverage products which information
was known at the time of an advertisement or sale if such failure to disclose such

information was intended to induce the consumer to enter into a transaction, C.R.S. 6-1-105(e);

and

d.      either knowingly or recklessly engaged in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice. C.R.S 6-1-105(kkk).

179. Defendants made false representations about the coverages that Defendants would provide under their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policies to Plaintiff individually and to the Colorado Classes at the time of sale, intending that the representations induce Plaintiff individually and Colorado Classes into purchasing the Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policy products.

180. Defendants' failure to disclose such information was intended to induce the public and consumers at large to enter into transactions with Defendants for Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance.

181. The material information Defendants failed to disclose was information Defendants knew at the time of their advertisement or sale of their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance policy products.

182. The actions of Defendants alleged herein were and are unfair acts or practices.

183. Defendants' deceptive trade practices occurred in the course of Defendants' business.

184. Defendants' deceptive trade practices significantly impacted Plaintiff and the public at large. A large number of consumers in Colorado, and elsewhere, including Plaintiff were and continue to be directly affected by Defendants' deceptive trade practices. The consumers directly affected by the deceptive trade practices had minimal, if any, bargaining power. The deceptive

practices have previously impacted Colorado consumers. Defendants' deceptive trade practices have a significant potential to impact other consumers in the future.

185. Defendants engaged in bad faith conduct in their deceptive trade practices meaning they acted fraudulently, willfully, knowingly and/or intentionally, causing damages and losses to Plaintiff.

186. Colorado residents, including Plaintiff, were the targets of these deceptive trade practices were, and are, actual and potential consumers of Defendants' Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance products.

187. Plaintiff and Colorado class members suffered injury to their legally protected interests as a result of such deceptive trade practices.

188. Defendants' deceptive trade practices with regard to their Business Income, Extra Expense Coverage and Extended Business Income Coverage insurance products directly and proximately caused actual damages and losses to Plaintiff and Colorado class members.

189. Such damages and losses include but are not limited to lost business income and extra expenses due to the COVID-19 pandemic.

190. These damages and losses are the direct and proximate result of Defendants' deceptive trade practices.

191. As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices of Defendants alleged herein, Plaintiff individually is entitled to relief under Colo. Rev. Stat. § 6-1-113, including, but not limited to, the greater of actual damages, statutory damages, or treble damages for bad faith conduct, injunctive relief, and attorneys' fees and costs, as allowable by law.

## Count VIII: Business Income Breach of Contract
### (By Plaintiff and the Missouri Business Income Coverage Class)

192. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

193. Plaintiff brings this claim individually and on behalf of the Missouri Business Income Coverage Class against Defendants.

194. Plaintiff's Policy and the policies of other Missouri Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

195. In the Policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the Policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

196. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

197. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

198. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

199. Defendants, without justification, have refused performance under the Policy and other

Class members' policies by denying coverage for these losses. Accordingly, Defendants are in

breach of the Policy and other Class members' policies.

200. Due to Defendants' breach of the Policy and other Class members' policies, Plaintiff and

other Class members have suffered actual and substantial damages for which Defendants are

liable, in an amount to be proved at trial.

### Count IX: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income
### (By Plaintiff and the Missouri Business Income Coverage Class)

201. Plaintiff realleges and incorporates by reference the allegations contained in all prior

paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads

this cause of action in the alternative.

202. Plaintiff brings this claim individually and on behalf of the Missouri Business Income

Coverage Class against Defendants.

203. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and

the Missouri Business Income Coverage Class in the following respects:

  a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the
     Class of the benefits of their policies;

  b. Unreasonably engaging in a pattern and practice of acting or failing to act in a
     manner that deprives Plaintiff and the Class of the benefits of their policies;

  c. Unreasonably failing to conduct a prompt, fair, balanced and thorough
     investigation of all of the bases of Plaintiff's and the Class' claims;

  d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt,
     fair, balanced and thorough investigation of all of the bases of claims made under
     Plaintiff's and the Class' policies;

e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k.  Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l.  Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m.  Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

204. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

205. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### Count X: Declaratory Relief
### (By Plaintiff and the Missouri Business Income Coverage Class)

206. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

207. Plaintiff brings this claim individually and on behalf of the Missouri Business Income Coverage Class against Defendants.

208. Plaintiff seeks a declaratory judgment pursuant to 735 ILCS 5/2-701.

209. Plaintiff's Policy and the policies of other Missouri Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

210. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

211. A covered loss has resulted in business suspensions, which have caused Plaintiff's and Class members' losses.

212. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the Policy and other Class members' policies.

213. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

214. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

215. Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

216. An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the terms of the Policy and Class members' policies.

### Count XI: Extra Expense Breach of Contract
### (By Plaintiff and the Missouri Extra Expense Coverage Class)

217. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

218. Plaintiff brings this claim individually and on behalf of the Missouri Extra Expense Coverage Class against Defendants.

219. Plaintiff's Policy and the policies of other Missouri Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

220. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

221. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

222. The extra expenses triggered the Extra Expense Coverage under the Policy and other Class members' policies.

223. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

224. Defendants, without justification, have refused performance under the Policy and other

Class members' policies by denying coverage for these losses and expenses. Accordingly,

Defendants are in breach of the Policy and other Class members' policies.

225. Due to Defendants' breach of the Policy and other Class member policies, Plaintiff and

other Class members have suffered actual and substantial damages for which Defendants are

liable, in an amount to be proved at trial.

### Count XII: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By Plaintiff and the Missouri Extra Expense Coverage Class)

226. Plaintiff realleges and incorporates by reference the allegations contained in all prior

paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads

this cause of action in the alternative.

227. Plaintiff brings this claim individually and on behalf of the Missouri Extra Expense Class

against Defendants.

228. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and

the Missouri Extra Expense Class with respect to the Extra Expense provisions in the following

respects:

a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the
Class the benefits of their policies;

b. Unreasonably engaging in a pattern and practice of acting or failing to act in a
manner that deprives Plaintiff and the Class of the benefits of their policies;

c. Unreasonably failing to conduct a prompt, fair, balanced and thorough
investigation of all of the bases of Plaintiff's and the Class' claims;

d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt,
fair, balanced and thorough investigation of all of the bases of claims made under
Plaintiff's and the Class' policies;

e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h.  Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i.  Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j.  Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k.  Unreasonably placing their own financial interests above the interests of Plaintiff and the Class;

l.  Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds; and

m.  Publicly misstating the terms of its Business Income policies in an attempt to dissuade policyholders from submitting claims.

229. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

230. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### Count XIII: Declaratory Relief
### (By Plaintiff and the Missouri Extra Expense Class)

231. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

232. Plaintiff brings this claim individually and on behalf of the Missouri Extra Expense Class against Defendants.

233. Plaintiff seeks a declaratory judgment pursuant to 735 ILCS 5/2-701.

234. Plaintiff's Policy and the policies of other Missouri Extra Expense Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by the policies.

235. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

236. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

237. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Class members' losses.

238. The extra expenses triggered the Extra Expense Coverage under the Policy and other Class members' policies.

239. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

240. Defendants, without justification, have refused performance under the Policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the Policy and other Class members' policies.

241. Plaintiff and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

242. An actual case or controversy exists regarding Plaintiff's and Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's Policy and other Class members' policies.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment against Defendants, as follows:

1. An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representative and its counsel as class counsel;

2. A judicial declaration declaring the meaning of the provisions concerning the business income coverage and extra expense coverage;

3. An award of damages to Plaintiff and the Classes in an amount to be determined at trial;

4. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5. An award of costs and attorneys' fees, as allowed by law; and

6.  Such other or further relief as may be appropriate.

Dated: November 4, 2020                Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By:  _/s/ Mark C. Goldenberg_
    Mark C. Goldenberg, #0990221
    Thomas P. Rosenfeld #06301406
    Kevin P. Green #06299905
    2227 South State Route 157
    Edwardsville, IL 62025
    P: 618-656-5150 / F: 618.656.6230
    mark@ghalaw.com
    tom@ghalaw.com
    kevin@ghalaw.com

    Richard S. Cornfeld, #0519391
    Daniel S. Levy, #6315524
    LAW OFFICE OF RICHARD S. CORNFELD, LLC
    1010 Market Street, Suite 1645
    St. Louis, MO 63101
    P: 314.241.5799 / F: 314.241.5788
    rcornfeld@cornfeldlegal.com
    dlevy@cornfeldlegal.com

    Anthony S. Bruning, #6181668
    Anthony S. Bruning, Jr., #6294898
    Ryan L. Bruning, #6304640
    THE BRUNING LAW FIRM, LLC
    555 Washington Avenue, Suite 600
    St. Louis, Missouri 63101
    P: 314.735.8100 / F: 314.898.3078
    tony@bruninglegal.com
    aj@bruninglegal.com
    ryan@bruninglegal.com

    Alfredo Torrijos*
    ARIAS SANGUINETTI WANG & TORRIJOS, LLP
    6701 Center Drive West, 14th Floor
    Los Angeles, CA
    P: 310.844.9696 / F: 310.861.0168
    alfredo@aswtlawyers.com

Kevin S. Hannon*
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, Colorado 80218
P: 303.861.8800 / F: 303.861.8855
khannon@hannonlaw.com

*Attorneys for Plaintiff*

*To seek admission per Ill. Sup. Ct. R. 707